### SMART et al. v. AMERICAN BANK & TRUST CO. et al.

### No. 12878.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 20, 1934.

Rehearing Denied April 6, 1934.

T. W. Dunn and Hiner & Pannill, all of Fort Worth, for plaintiffs in error.

Rufus S. Garrett, of Fort Worth, for defendants in error.

DUNKLIN, Chief Justice.

On November 8, 1928, J. O. Smart sold to Peter Droppleman an undivided half interest in lot 1, block 4, Brooklyn Heights addition to Fort Worth, on which was located a grocery store, a barber shop, café, a rooming house consisting of 14 rooms, a tailor shop, and a filling station. The consideration for that conveyance was $1,000 cash paid, the assumption by Droppleman of $4,000, which was one-half of the total incumbrances outstanding against the property, and the execution and delivery to Smart of the following instrument in writing:

"Contract Agreement
"November 7, 1928.
"State of Texas, County of Tarrant.

"This is an agreement between Pete Droppleman, 1529 Owassa St., Ft. Worth, Texas, hereinafter known as party of the first part, and J. O. Smart, 3971 Lafayette St., Ft. Worth, Texas, hereinafter known as party of the second part.

"Party of the first part, for and in consideration of the sum of $1.00 paid this date, and receipt of which is hereby acknowledged, and other valuable consideration, is selling to party of the second part one-half of all the oil and gas rights that party of the first part now owns in Coffey County, Kansas, this date, Nov. 7th, 1928.
"[Signed]   J. O. Smart
"[Signed]   Pete Droppleman
"[Signed]   Helen Droppleman
"B. W. James, witness.
"Byron Collier, witness.

"The State of Texas, County of Tarrant.

"Before me the undersigned authority, a notary public in and for Tarrant County, Texas, on this day personally appeared J. O. Smart and Pete Droppleman, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purpose and consideration therein expressed.

"Given under my hand and seal of office this 8th day of November, A. D. 1932.
"[Seal]        [Signed]  B. W. James,
"A Notary Public in and for Tarrant County, Texas."

Some seven months thereafter, and on, to wit, June 6, 1929, Droppleman reconveyed to J. O. Smart the half interest in the property theretofore acquired. The consideration for that conveyance was $1,000, evidenced by a promissory note executed by J. O. Smart and wife, Aurelia Smart, and J. M. Miller, father of Mrs. Smart, and the assumption by Smart of the same indebtedness against the property theretofore assumed by Droppleman. Droppleman hypothecated the note to the American Bank & Trust Company to secure the indebtedness to it; and the bank instituted this suit thereon against the makers, who interpleaded Droppleman, on allegations that the suit had been brought in the name of the bank for the benefit of Droppleman, the own-

er of the note, in order that the latter might evade a cross-action against him by Smart; and he interpleaded Droppleman as a party to the suit. Droppleman answered that plea, alleging that the note had been hypothecated with the plaintiff as collateral security for indebtedness he owed the bank but which later had been paid; and he sought a recovery thereon against the original defendants. Smart then filed a cross-action against Droppleman, but urged no defense to the note itself.

On the trial, the original plaintiff bank was denied a recovery because of proof made that it had held the note as collateral security only, title to which is now in Droppleman, since the debt for which it was hypothecated had been discharged. Judgment was rendered for Droppleman against J. O. Smart and J. M. Miller on the note and denying to Smart any recovery on his cross-action. Mrs. Aurelia Smart, his wife, was discharged on her plea of coverture.

J. O. Smart and J. M. Miller have prosecuted this writ of error, and the only complaint here is to the action of the trial court in instructing the jury to return a verdict denying J. O. Smart a recovery on his cross-action against Droppleman; no defense to the note sued on being suggested.

The claims against Droppleman in the cross-action were as follows: First. For $5,000 based upon allegations that, when Droppleman purchased from Smart a half interest in lot 1, block 4, Brooklyn Heights addition to Fort Worth, he represented to Smart that the half interest in the Kansas oil lease described in the written contract set out above was of the reasonable market value of $5,000, and was accepted by Smart at that value, agreed to by Droppleman, as a part of the consideration for one-half interest in the Fort Worth property; that Droppleman's said contract was insufficient to convey title to the oil lease and Droppleman agreed at the time to later execute to Smart such a conveyance; but had refused Smart's request therefor; that the lease was worthless and was later forfeited after a test well drilled thereon had produced no oil; and further that he (Smart) had lost an opportunity to sell the lease for $5,000 by reason of Droppleman's failure to execute another instrument specifically conveying title thereto, additional to said contract. Second. Claim for $783, the aggregate of the following items: (a) $125 for Smart's half of certain furniture, alleged to have been taken out of the rooming house by Droppleman during the time he and Smart held the property as tenants in common after the latter had purchased one-half interest therein; (b) $258 as one-half of a total alleged to have been paid out by Smart to discharge certain "taxes, interest, and liens against said premises"; (c) $50 as one-half of $100 which Smart alleged he paid out for certain repairs and improvements on the buildings, consisting of erection of partitions, plumbing, painting, and papering of rooms; (d) $350 which Smart alleged Droppleman agreed to pay him and his wife for their services in caring for the property and collecting rents thereon.

Even if it be said that the "contract agreement," copied above, for lack of more definite description of the oil lease therein referred to, was insufficient to serve as a deed of conveyance, yet it cannot be doubted that it imported such an equity in favor of Smart as, with the aid of other testimony appearing in this record, would have served as a basis for a reformation and correction of that instrument in such manner as to convey a legal title to the 462 acres, which both parties testified was understood to be meant to be covered. The testimony of Smart himself showed that about two months after its execution he and Droppleman made a trip to Kansas to inspect the lease with a view to realizing thereon, and found a producing oil well thereon, which Droppleman said would pump 25 barrels a day, and later, and before the reconveyance of the Fort Worth property, made a second trip with a geologist and found that the well was producing only one barrel a day. Notwithstanding that discovery, Smart did not demand a rescission of the sale he had made to Droppleman of the Fort Worth property, or in lieu thereof for payment to him of $5,000, but elected to hold the "contract agreement" until the oil lease was entirely lost by forfeiture for failure to pay rentals accruing thereon; and thereafter accepted a reconveyance of Droppleman's interest in the Fort Worth property without making any complaint of Droppleman's failure to execute a further assignment of the oil lease; nor did he offer any testimony tending to show any understanding between them that he would thereafter make any claim against Droppleman growing out of the oil lease agreement. And he wholly failed to introduce sufficient competent evidence to support his allegation that he lost the alleged opportunity to sell the lease for $5,000 by reason of Droppleman's failure to execute another instrument more specifically describing the oil lease referred to in the contract agreement. His testimony to alleged statements made by Droppleman at the time the latter purchased a

half interest in the Fort Worth property, to the effect that the oil lease was worth $5,000, showed of itself that that statement was merely trade talk and insufficient to amount to prima facie proof that Droppleman was warranting the oil lease to be worth $5,000, and that but for such warranty Smart would not have made the conveyance to Droppleman.

■■ The cross-action for the other items enumerated, aggregating $783 for taxes, interest, repairs, etc., was in the nature of a suit for accounting between him and Droppleman while the two were tenants in common of the Fort Worth property. It was incumbent upon Smart to account for the rents and revenues which he had received from the property while he was in exclusive control of it, under the agreement between him and Droppleman, in order to show a net balance in his favor after allowing credits accruing to Droppleman from the revenues so received. But his pleading was wholly silent on that point, and upon the trial the undisputed proof showed that he had collected large amounts of such revenues, evidence of which was peculiarly and exclusively within his own knowledge. According to the testimony of Droppleman, not denied by Smart, after Smart's deed to him, he paid $84 taxes on the property and also for the abstract of title therefor, and that once during their joint tenancy Smart had rendered to him a stated account, showing an admission of $685 accruing to Droppleman's credit from revenues realized by Smart during his control and management of the property. And in his testimony on the trial Smart admitted that during the joint tenancy of himself and Droppleman he had realized $270 rentals per month on the Fort Worth property.

Furthermore, there was introduced in evidence an answer which had been filed by him as defendant in another suit instituted by S. P. Osborne to foreclose a lien upon the Fort Worth property above mentioned and embodying these allegations: "That said property on August 10, 1929, was reasonably worth on the open market for cash the sum of $20,000.00; that at the time the said property was conveyed to F. D. Turner and the above notes were executed, said property was bringing in rental in the sum of $3080.00 per year, or was bearing 10% upon an investment of more than $30,000.00; wherefore, these defendants say that this property was easily worth the sum of $20,000.00 in cash on the open market on the day the same was conveyed to the defendant F. D. Turner, which was on or about the 12th day of July, 1929."

Smart admitted that that answer was filed by his attorney employed in that case, but he did not testify that that allegation was untrue or that it was put in his pleading without his authority. It is to be observed further that August 10, 1929, the date given in that pleading, was only about two months subsequent to June 6, 1929, the date when Droppleman reconveyed the property to Smart, and therefore the admission made in the pleading that the property was rented for $3,080 a year covered the seven months' period during which Droppleman held a half interest in the same property. It is to be observed further that the evidence introduced rendered it altogether impossible to say that in an accounting between the two parties the items aggregating $783 embodied in the cross-action amounted to more than, or as much as, the credits due Droppleman for his part of the rents collected by Smart, even if Droppleman's positive testimony and other circumstances tending to corroborate him, in substance, that his reconveyance to Smart was by way of a complete rescission of the former conveyance and for no other consideration, be rejected in its entirety.

For the reasons indicated, we conclude that the trial court did not err in instructing a verdict rejecting the cross-action in its entirety; and accordingly the judgment of the trial court is affirmed.

## On Motion for Rehearing.

The statement in our original opinion, to the effect that plaintiff Smart accepted the reconveyance of Droppleman's interest in the Fort Worth property without making any complaint of the latter's failure to execute a further assignment of the oil lease and that no testimony was offered to show any understanding between them that Smart would thereafter make any claim against Droppleman growing out of the oil lease agreement, is withdrawn in view of the following testimony given by Smart and inadvertently overlooked by us:

"We left his house there and came on over to town here—and finally he said that he would give $1,000 or take $1,000, and I told him then that since he was fair about it I would sell him my interest, since I didn't have the money to buy his. For some reason or another, he decided that he wanted to sell to me, and finally I told him that if he wanted to do that I would give him $1,000 and get Mr. Miller to sign the note, which I did.

"Q. What was said, if anything, between you and Droppleman about what Droppleman

owed you? A. We discussed that in particular, and he said that we would get some money out of the deal and settle up everything and get this note and settle up our business later. He told me that he thought I could sell it and get us out all right.

"Q. I will ask you to state to the jury what was said there about all of the various items, if anything was said, when you made a deal buying the property back from Droppleman? A. I spoke to him about this particular lease in Kansas, and it looked like at that time it was hard to get anything out of it, and he had not yet given me a lease, as agreed to, so I told him I thought he ought to straighten up and figure out our affairs, the difference between us, and he said we would go ahead and fix up the note and straighten it all out later. The note was made payable twelve months from then, and I did that, and in about three or four or five months after that was when I thought I had a chance to sell it, and I spoke to him about the lease. For some reason he never did deliver it, and of course I never disposed of the lease."

Smart further testified as follows:

"Q. After the demand on Mr. Droppleman for the lease which you testified to here awhile ago, has there ever been anything else said between you and Mr. Droppleman about these matters? A. No sir, I haven't seen him for eight or nine months until I met him here in the court house. The only thing else which was said about it, Mr. Dickinson, a real estate man here in town, was handling some real estate for Mr. Droppleman, and Dickerson called me up and asked me about it, and I told him that I thought Droppleman owed me something, and I wanted a settlement with him on that before he traded that note.

"Q. Did you ever get a settlement? A. No sir; the next thing I knew was when Mr. Droppleman had taken the note and placed it with the American Bank & Trust Company."

■ The testimony introduced shows conclusively that the purpose of Droppleman's conveyance of the property to Smart was to restore the status quo of the parties by returning to Smart what he had theretofore conveyed to Droppleman. Both Droppleman and Mrs. J. O. Smart, wife of the plaintiff, who was introduced by him as a witness, denominated the transaction as a trade back. The price in both transactions was the same, with the added advantage to Smart that, in lieu of returning to Droppleman the $1,000 cash which the latter had paid, Smart executed the note for $1,000 sued on in this case, and that too leaving Droppleman still bound by his assumption of one-half of the outstanding indebtedness against the Fort Worth property. That transaction amounted, in legal effect, to a rescission of the original contract of sale with respect to Smart's cross-action to recover the $5,000 upon his allegation of Droppleman's agreement to pay the same in lieu of the oil lease as a part of the consideration for the first conveyance. If that agreement was made, then the contract of sale to Droppleman was executory to that extent.

In 10 Tex. Jur. § 223, p. 393, the following announcement is fully supported by numerous decisions cited: "As a general rule rescission puts an end to the contract, and in this respect a technical rescission is to be distinguished from the right of a party to abandon the contract as regards further performance, where the other party renounces it and refuses further performance. The contract is not merely terminated, but is abrogated and annulled from the beginning. The rights and liabilities of the parties are extinguished, and they are restored to the relative positions which they would have occupied if no such contract had ever been made. If any cause of action exists in favor of either party against the other, it is necessarily independent of the contract and separate and apart from any of its terms. So the party who has rescinded may not sue on a note running to him for money payable under the contract, nor recover damages against a third person who has converted personal property mortgaged to secure such a note. Rescission of a contract for the sale of realty by the vendor re-invests the title in him as completely as if the contract had never been executed, and puts an end to a lien given by the contract for the purpose of securing its performance." See, also, 27 R. C. L., pp. 640, 641, 666; 66 Corpus Juris, p. 1056, § 818.

We quote the following from 24 R. C. L. § 555, p. 276: "The mutual rescission of an executory contract of sale puts an end to any obligation of the parties further to perform or liability for the nonperformance of the contract. And though the sale is executed so as to pass title, a mutual rescission and return of the property to the seller releases the buyer from any liability for the price."

The following statement in 66 Corpus Juris, p. 1379, is well supported by decisions cited: "When the vendor rescinds the contract or declares a forfeiture, such rescission or forfeiture is a good defense to an action by him to recover the unpaid purchase money, his only right of action being for the purchaser's breach of contract."

In 2 Black on Rescission and Cancellation, § 417, this is said: "A rescission may be affected by a reconveyance of the land from the vendee to the vendor, accepted by the latter, with delivery of possession, and it is none the less effective as a rescission because there is a collateral agreement that the vendor will hold the land a certain length of time for the vendee, and then sell to him, if he desires, on the original terms."

Same volume, § 528: "The rescission of a contract by mutual consent does not require a formal agreement or release, but may result from any act or any course of conduct of the parties which clearly indicates their mutual understanding that the contract is abrogated or terminated, or from the acquiescence of one party in its explicit repudiation by the other. * * * So, when the vendee is in default as to payment, and the vendor is in default because he cannot give a good title, the demanding of possession by the vendor and the surrendering of possession by the vendee amount to a rescission of the contract. Similarly, if the vendor takes from the vendee an assignment, release, or other transfer of the latter's interest under the contract of sale, it effects a dissolution of the contract."

Again section 531: "When goods have been delivered to the buyer under a contract of sale and he returns them to the seller, and the latter accepts the redelivery, and resumes and retains possession of the property as his own, and does not notify the buyer that he intends to hold it subject to his order or sell it for his account, the transaction operates as a complete rescission of the contract of sale. And it appears to be immaterial, in respect to the application of this rule, whether the purchaser assigns any reasons for returning the goods, or what his specified reasons may be, whether a deficiency in quantity or quality, a general dissatisfaction with the property, his inability to pay, or a mere wish to be released from his bargain. For his return of the goods is an offer to rescission, and the acceptance and retention of them by the seller is an acceptance of that offer, and thereupon a rescission is effected, not necessarily for legally sufficient cause, but by the mutual consent of the parties."

And section 535: "But after a contract has been rescinded by mutual consent, it cannot be made the basis for any action by one party against the other, except in so far as is necessary to the restoration of the status quo. All breaches of the contract are waived by the rescission, and no action can be maintained for any such breach, nor upon any cause of action arising out of the abrogated contract, nor for damages for its nonperformance, nor for compensation for being prevented from performing under it."

It follows, therefore, that, even if it be said that the valuation Droppleman put upon the oil lease of $5,000 and his alleged guaranty thereof, as testified by Smart, was an enforceable demand against Droppleman for that sum, and not mere trade talk, as we concluded in our original hearing and which conclusion we adhere to, nevertheless Smart's cross-action to recover thereon was extinguished by his acceptance of Droppleman's reconveyance of the same property to him. Furthermore, even though it could be said that Smart's testimony, quoted above, was sufficient to show a reservation of right in Smart to assert that demand after the reconveyance was made, which we gravely doubt, yet that reservation was not expressed in Droppleman's deed of reconveyance, and there was no plea that through fraud, accident, or mistake it was omitted therefrom.

According to the undisputed testimony, when Droppleman bought from Smart a one-half interest in the Fort Worth property, it was understood between them that Smart would manage and control it, collect the rents therefrom, and pay the expenses incurred during the joint tenancy out of those revenues, and during the seven months of the joint tenancy Smart and his wife had the entire management of the property under that agreement. As already noted, Smart in his cross-action made no accounting of the rents received and expenses incurred in the management of the property. Such an accounting should have been made in the pleadings in order to establish his claim against Droppleman for the items claimed in the cross-action over and above the $5,000 for the oil lease. But, aside from the question of pleading, it was manifestly incumbent upon him to make that proof upon the trial of the case; and the testimony introduced by him was wholly insufficient for that purpose.

Plaintiff Smart testified in part as follows: That he rendered a statement to Droppleman showing $300 due him out of the rents from the property, but further said that covered some rents which were uncollected at the time and later not collected. When questioned about a statement which Droppleman had testified that Smart had rendered to him showing $685 due him from the rents and then withdrawn by Smart, the witness testified he did not remember such a statement.

And in this connection we will add that the statement in our original opinion, to the effect that Droppleman's evidence was not denied by Smart, is qualified to that extent.

After testifying to the agreement between him and Droppleman that he (Smart) was to look after the Fort Worth property during their joint tenancy, Smart testified as follows:

"Q. What was the income from the property at the time you made this trade with Mr. Droppleman? A. About $270.00 a month, this property here. There were some months I collected and some months I didn't collect.

"Q. You had tenants in there paying you $270.00 when they paid you? A. Yes, sir.

"Q. Have you anything to show the amount of money which you collected during those months you were in business with Mr. Droppleman? A. No, sir.

"Q. Did you ever make any accounting to Pete Droppleman for the amount of money you collected from that building out there? A. My wife might know. * * *

"Q. Are you in position now to tell the jury what sum of money, if any, you collected during the seven months you had that property out there? A. No, sir, I am not.

"Q. Are you in a position now, or were you ever in a position to make an accounting to Pete Droppleman for the moneys you collected out there? A. No, sir, my wife was looking after that."

■ Mrs. J. O. Smart, introduced as a witness for the plaintiff, testified that she did nearly all of the work of caring for the Brooklyn Heights property, which consisted of a drug store, restaurant, barber shop, tailor shop, and rooming house, which was equipped with 32 rooms and which were rented out by the night, week, or month; that she collected the rents; that repairs were made, consisting of plumbing, putting in partitions, windows, doors, and other things necessary for the upkeep of the property. But neither she nor her husband testified to the cost of the repairs. She testified that she paid for the repairs out of the rents whenever there was an amount on hand sufficient to pay them, but sometimes the rents would come in later. She further admitted that at the end of three months following Droppleman's purchase she rendered a statement to him showing a balance due him of $300, but did not recall rendering another statement showing a balance of $685. She further testified that during the negotiations between her husband and Droppleman for the reconveyance by Droppleman to Smart she was present and discussed with Droppleman the transaction, and that, when she signed the note sued on with her husband and her father, Miller, she knew that Droppleman had not realized a penny out of it; and she further testified to the signing of the note in suit, without making any claim that Droppleman owed any of the items asserted in the cross-action. Furthermore, no witness testified to the market value of the oil lease in controversy at the time of Smart's conveyance to Droppleman. Testimony that several months thereafter it proved to be worthless would not of itself show that it had no market value at the time of that conveyance. The alleged warranty, if any, by Droppleman, of $5,000 as the value of that lease was of a present value and not of value for an indefinite period.

The motion for rehearing is overruled.

LATTIMORE, J., not sitting.